A. E. BURNS, Appellee, v. C. A. BURROWS, Appellant.

FRAUDS, STATUTE OF: What Constitutes "Signing." The require-
ment of the statute of frauds that the writing be signed by the
party to be charged, is sufficiently complied with by the act of the
mutual agent of the parties in indorsing upon a lease a written
modification thereof as to the term thereof, and by said agent's
signing said modification by affixing the *initials* of *his* name thereto.

*Appeal from Black Hawk District Court.*—GEORGE W. WOOD, Judge.

DECEMBER 11, 1923.

SUIT in equity, to enjoin an action to obtain possession of leasehold premises occupied by plaintiff, and to reform a written lease of said premises. Decree was entered, granting the relief prayed. Defendant appeals.—*Affirmed.*

*Edwards, Longley, Ransier & Harris,* for appellant.

*Merner & Merner,* for appellee.

ARTHUR, J.—I. On March 6, 1916, one D. N. Wild leased to plaintiff, A. E. Burns, a storehouse and basement in Cedar Falls, Iowa, for the term of five years, commencing on the 15th day of April, 1916, and ending on the 15th day of April, 1921, at a monthly rental of $65. The lease provided for certain altera-tions and improvements to be made to the storeroom, to fit it for plaintiff's use in the cafe and restaurant business, and that no rental should be due or payable until said room was ready for occupancy. The lease further provided that Burns should have the privilege of leasing said premises for an additional five-

year period, upon the same terms and conditions, upon giving the landlord 90 days' written notice thereof, before the expiration of his lease. The alterations and improvements of the storeroom provided for in the lease were not completed and the premises ready for occupancy by Burns until about the 1st of June, 1916. About October 25, 1916, Wild, owner of the building, sold it under contract to defendant, Burrows, subject to plaintiff's leasehold interest therein, and Wild's interest in the lease was to be assigned to Burrows. The conveyance and transfer to Burrows by Wild were not completed until the latter part of January, 1917. Plaintiff claimed that, before the sale to Burrows, he had an oral agreement with Wild that, in view of the fact that the room was not completed and ready for occupancy until within a few days before the 1st of June, the five-year leasehold term should begin June 1, 1916, and end June 1, 1921; that thereafter, on or about December 7, 1916, when he learned that Burrows had bought the property, he told Burrows of his agreement with Wild, changing the beginning and termination of the lease to June 1st, and that he wanted the change or addition made upon his written lease, and suggested that they go to an attorney, to have it done; that, at the request of Burrows, he and Wild and Burrows went to the office of Santee Bros., real estate dealers, who had negotiated the sale of the property to Burrows; that R. A. Santee, a member of the firm of Santee Bros., was in his office; and that Burns, in the presence of Burrows and wife, told Mr. Santee that they wanted an addition made to the lease, fixing the commencement of the term as of June 1, 1916, and the termination on June 1, 1921. Thereupon, Mr. Santee, in the presence of the three men, Wild, Burns, and Burrows, wrote at the bottom of the lease, the duplicate being held by Burrows, the following:

"It is mutually agreed between Dan Wild, A. E. Burns, and C. A. Burrows that the date of the beginning of this lease is June 1, 1916. (Put on by R. A. S.)"

This writing was made on the Burns copy of the lease only. Burrows did not have his copy with him at the time. When Santee had finished the writing, Burns inquired whether it was necessary for the parties to sign it personally, and was informed by Santee,—and Burns claims, by Burrows also,—that it was

not; that, so long as it was mutually agreed by them, and so long as he had put their names in the body of it, that was all that was necessary. After Burrows purchased the property, Burns attorned to and paid the rent to Burrows.

On February 28, 1921, and again on March 1, 1921, Burns notified Burrows of his intention to occupy and lease said premises for an additional five years, as provided in the original lease. After serving such notice, Burns expended several hundred dollars in decorating and painting the storeroom. Burrows knew of such improvement, and made no objection. On March 28, 1921, Burrows served on Burns notice to quit and deliver possession of said premises on the 15th day of April, 1921, and threatened to evict plaintiff. Burns had equipped the premises for cafe and restaurant business, at an expense of about $8,000, and claims that the equipment of said room for such purpose was made in reliance upon the lease made with Wild, and in expectation of an extension of said lease or a new lease for an additional five years.

On April 13, 1920, Burns began this action to restrain defendant from interfering with his possession and occupancy of the leasehold premises. A temporary injunction was issued, as prayed. Defendant filed an answer and cross bill, demanding immediate possession. The court found the issues with plaintiff; that the additional writing placed at the bottom of the lease was binding upon defendant; and that the lease should be reformed by adding, "and its termination June 1, 1921," thus making the addition read:

"It is mutually agreed between Dan Wild, A. E. Burns, and C. A. Burrows that the date of the beginning of this lease is June 1, 1916, and its termination June 1, 1921. (Put on by R. A. S.)"

The court also found that plaintiff was entitled to an injunction restraining defendant from instituting an action for forcible entry and detainer; that defendant was not entitled to immediate possession of the leased premises. Judgment and decree was entered accordingly, from which this appeal is prosecuted.

II. The events preceding the writing of the addition in controversy upon the lease, and the facts concerning the writing of said addition, are detailed in the testimony of Burns, Santee,

and Burrows. Mr. Wild, the only other person who was present when the writing was made, did not testify. He was incapacitated, being, at the time of the trial, an inmate of the state hospital for the insane, at Independence.

A. E. Burns testified, in substance, that, after Burrows bought the property, he paid Burrows on the 25th of each month, in advance, instead of paying rent on the first of every month, as he had been doing to Wild; that he offered Burrows, in money, the rent on March 25, 1921, being the rent from March 25th to April 25th, and Burrows refused to accept it; that, after Burrows had bargained for the property, Wild told him that Burrows was entitled to the rent; that he then reminded and stated to Wild and Burrows that the lease was to be changed to begin June 1st; that this conversation was on December 7, 1916, and that Mr. Burrows said that it was very satisfactory to him.

"I said, 'Well, we will go up to my attorney, and have it changed.' Mr. Burrows said that Mr. Santee was handling the deal for him and Mr. Wild, and why not drop right into his office?"

He further testified that, upon such request by Burrows, all three "went into Mr. Santee's office, and Mr. Santee put this mutual agreement between three of us on this lease of mine;" that Mr. Burrows said that Mr. Santee was handling the business for him and Wild, and was a notary public, and could write the agreement just as well as anybody; that he, Burns, agreed to the request of Burrows that Santee should make the change in the lease for them; that, when they got into the office of Santee, Santee asked what they wanted; that he suggested that, as they had gone to the office of Santee at the request of Burrows, Burrows tell Santee about the business they wanted transacted; that Burrows then asked him to tell Santee what they wanted done; that he, Burns, then told Santee that they wanted the term of lease changed so as to begin the 1st of June, 1916, instead of the 15th of April, as the original lease called for, and to end on June 1, 1921, owing to the fact that he, Burns, had not gone into the building until about the 1st of June; that, after he had so stated their business, Burrows said that that was satisfactory to him; that Santee then wrote the addition in controversy on a

copy of the lease which he had with him; that Burrows did not
have his copy of the lease with him, and it was not written on
Burrows' copy; that, after Santee had written the addition on
the lease, he asked Santee if it was necessary ''for us to sign
it,'' and Mr. Burrows stated that it was not, so long as it was
put on by a notary public and ''we all agreed to it.'' Mr.
Santee also stated that ''it was not necessary for us to sign it,
as long as it was mutually agreed before him, and he had put
this in, and our names were included in the agreement.'' Burns
further testified that he requested and intended, and Wild and
Burrows agreed to it, that the writing should state that the term
was to begin June 1, 1916, and end June 1, 1921; but that the
phrase ''and end June 1, 1921,'' was by mutual mistake omitted;
that he relied upon the statement of Burrows and Santee that it
was not necessary that the addition written on the lease be
personally signed by the parties; that he relied upon the agree-
ment written on the lease in serving notice on Burrows of his
intention to exercise the privilege of renting the property for
the additional five-year term provided in the lease; that he relied
upon it that the term of his lease would end June 1, 1921; that,
after he notified Burrows, about the 1st of March, 1921, of his
election to hold the property for an additional five-year term, he
painted and decorated the property, at an expense of about $211;
that the painting and decorating were done before Burrows
served notice on him to quit; that Burrows was in the cafe for
meals every day while the painting and decorating were being
done, and knew that such improvement was being made; that
Burrows did not serve notice on him to quit until the painting
and decorating were all done; that he had installed complete
equipment of the premises for cafe, restaurant, and soda foun-
tain business, at an expense of about $8,000, in pursuance and
reliance upon his original five-year lease and an additional five-
year term, to end on June 1, 1926; that, if evicted, he could not
obtain a suitable building for his business at the present time,
and he would sustain a considerable loss. Burns further testi-
fied that, shortly before Burrows bought the property, Wild had
some carpenter work done on the building and furnace, and
assigned the account for rent to cover said bills; that he did not
pay the rent on October 25th because Wild told him not to pay

it to Burrows and Burrows told him not to pay it to Wild, and that it was not until December 7th, when Wild and Burrows settled, that Wild and Burrows agreed that he should pay the rent to Burrows, and so told him; that he understood that the deal between Wild and Burrows was not completed until December 7th, on account of Mrs. Wild's not signing the deed until that time, and that there was never any full settlement until December 7th; that he, Burns, had advanced money to Wild to have carpenter and furnace work done, and that, owing to the fact that the building was not fully completed until nearly the 1st of June, it was agreed between him and Wild and Burrows, that the lease should be changed to June 1st; that it was agreed between himself and Mr. Wild that the lease should be changed to begin June 1, 1916, and end on June 1, 1921, and it was agreed between Mr. Burrows and himself that such change should be made; that Mr. Burrows said that the change was satisfactory to him,—that it did not make so much difference to him, because he did not have title to the building at the time; that he said, "Let him [Santee] put that on." Witness further testified that, on January 25, 1921, when he paid Burrows the rent, Burrows asked him if he was intending to keep the building for the other five years, and he told Burrows that he was, and Burrows said, "Well, that is all right,"—that he "just wanted to know, was all;" that he told Burrows that he intended to keep the building, and would serve him with 90 days' notice in plenty of time; that shortly afterwards he showed Burrows the lease and addition thereon written by Santee, and told him that he would serve his 90 days' notice in plenty of time; that Burrows then said "that wasn't altogether necessary, just so he understood that I wanted the building."

R. A. Santee testified, in substance, that he was engaged in the real estate business, and had been for 29 years; that he was a member of the firm of Santee Bros., who negotiated the sale of the property in controversy from Wild to Burrows; that the property was sold to Burrows about the 25th of October, 1916; that the sale was completed and conveyance made in January or February, 1917; that he became associated in the ice business with Mr. Burrows in the spring of 1917, shortly after the transaction involved in this case, and was so associated at the time

of the trial; that he remembered the occasion when Burns, Wild, and Burrows came into his office and requested him to make a certain written addition or memorandum upon the lease which Wild had given to Burrows; that it was in the early part of December; that Wild, Burrows, and Burns were all present; that he wrote the written addition at the bottom of the lease, in the presence of Wild, Burrows, and Burns; that:

"When they came into my office, they told me that they wanted to arrange to put on something that would make the lease begin June 1st. I cannot tell who told me that, but they were all there together. I don't remember as there was anything said with reference to the ending of the term, and yet there might have been. I just don't remember now whether one or each of them asked me to put this notation upon the lease. There was some discussion as to the whole situation, especially between Mr. Burns and Mr. Burrows, with reference to the necessity of the parties' signing this addition personally. I explained that I thought this was sufficient, when I had identified each one of them as being there, and I told them it was unnecessary to sign this addition personally. They assented or acquiesced in what I told them."

Witness further testified, over objections made,—his testimony being based upon his knowledge of the transactions of the sale of the property and the statements made to him by the parties,—that it was the intention and agreement of the parties that the beginning of the lease should be changed from April 15th to June 1st, and that, if the lease was to run for five years, the termination would be five years from June 1st; that he was very positive that that was the intention as to the beginning of the lease; that he was not quite clear as to whether it was fully talked out as to the ending or not, but that that would follow, if the lease was for a five-year term; that he did not put the addition on Mr. Burrows' copy of the lease because Mr. Burrows said he did not have it with him; that the parties talked about the necessity of signing the memorandum; that he told them that it wasn't necessary, as long as they were all present and he put their names in the memorandum; that he knew that Burns had been in the property since May 18th.

"I put the commencement June 1st, instead of May 18th,

because that is when they agreed it should be. It was not that the rent was to begin May 18th, but that they agreed that the lease should begin June 1st. I wrote down just what they asked me to,—what they told me they had agreed on.''

Burrows testified in substance: that, when Burns paid him the rent, on February 25, 1921, Burns said he was preparing a notice of intention to renew the lease; that notice was served on him about the 1st of March, 1921; that, ''at the meeting in Santee's office on December 7, 1916, Mr. Burns and myself and Mr. Santee were there;'' that Mr. Wild might have been present, —''I really do not remember whether he was or not;'' that it was the latter part of January, 1917, that he received the deed to the property; that the deal was not closed on December 7, 1916, at the time they were in Mr. Santee's office; that, on March 25, 1921, he went to see Burns, and asked him to pay the rent up to April 15, 1921, instead of a full month's rent, and that Burns had the money in his hand, and offered to pay the full month's rent; that he had at least one meal a day in Burns's cafe; that he saw the painting and decorating being done by Burns during March, 1921; and that he said nothing about it.

III. The principal question in the case is whether or not the commencement and termination of Burns's five-year leasehold term of the premises was legally changed from April 15th to June 1st, and whether such change was binding upon appellant. The court below held that the change in the commencement and termination of the lease from April 15th to June 1st was properly made, and binding upon Burrows; that he had knowledge of and accepted the same; that the addition to the lease should be reformed so as to fix the termination June 1, 1921.

Appellant's main contentions are, in substance, that the addition claimed to have been made to the lease was not in writing and signed by the party to be charged, as required by the statute of frauds; that said memorandum or claimed addition to the lease was not and did not become part of the contract existing between the parties, and was not subject to reformation as a part of said contract; that the evidence produced by appellee was not of that clear and satisfactory character required, to entitle him to reformation of the contract. The addition to the

lease, changing the date of the beginning of the term to June 1, 1916, was in writing, and contained in the body thereof the names of the parties interested. But was such writing, in effect, signed by the parties or their agent? The addition reads:

"It is mutually agreed between Dan Wild, A. E. Burns and C. A. Burrows that the date of the beginning of this lease is June 1, 1916. (Put on by R. A. S.)"

We think that the evidence in the case before us clearly and satisfactorily establishes that the alteration as to date of commencement of the lease was placed thereon at the instance and request of Burrows, as well as of Wild and Burns, and that Santee, in writing such addition to the lease, acted as the agent of all the parties. 29 Am. & Eng. Encyc. of Law (2d Ed.) 856; 6 English Ruling Cases 282, note; 7 Am. & Eng. Encyc. of Law (2d Ed.) 143.

There can be no question but that Santee could properly be the agent of all the parties for the purpose of writing and signing the addition to the contract, if he was authorized by them so to do; and we think the evidence shows that such authority was conferred upon him. *Batturs v. Sellers & Patterson*, 5 Harris & Johnson (Md.) 117 (9 Am. Dec. 492); *Butler v. Thomson*, 92 U. S. 412 (23 L. Ed. 684).

Santee signed the writing by the use of his initials. It has been held that a signature may be made by the use of initials. 29 Am. & Eng. Encyc. of Law (2d Ed.) 857; *Brown v. Butchers & Drovers Bank*, 6 Hill (N. Y.) 443 (41 Am. Dec. 755).

The name of Burrows appears in the body of the addition to the lease under consideration. It was placed there by Santee, and Santee signed the writing by the use of his own initials. Burrows says that he did not authorize Santee to make written alteration of the lease and to write his name in the body thereof. Burrows, Burns, and Santee were present when the writing was done. Burrows hesitatingly denies that he was present. He says he does not remember being present. Burns and Santee testify that Burrows was present, and agreed to the change, and told Santee to write it upon the lease. Upon a careful examination of the evidence, we have no hesitancy in finding that Burrows was present, and agreed to the change made, and authorized Santee to write such alteration upon the lease as it was

written. In any event, the conduct and acts of Burrows would constitute complete estoppel. We think that the evidence clearly shows that it was the intention of the parties to alter the lease so that the term should begin the 1st of June, 1916, and end on the 1st of June, 1921. While the reformation of the lease by adding the phrase, ''and its termination June 1, 1921,'' was not necessary, under the record, to secure to appellee his rights, the evidence fully warranted such reformation, and the court was authorized, under the record, to grant reformation as prayed.

Results in affirmance of the decree of the lower court.— *Affirmed.*

PRESTON, C. J., EVANS and FAVILLE, JJ., concur.